# EXHIBIT A



*Failure Analysis Associates®*

May 23, 2012


Holly Podulka, Esq.
Schiff Hardin LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606


Subject:   Robinson v Newell Window Furnishings, Inc., et al.
               Project No. 1201914

Dear Ms. Podulka:

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology with Distinction and Honors from Stanford University and hold a Ph.D. in experimental psychology also from Stanford University. I am a Principal Scientist and Director of the Human Factors Practice at Exponent. The field of human factors is the scientific study of the limitations and capabilities of people as they use products, machines, and systems in their environments. My work with Exponent includes the analysis and evaluation of human factors issues for many different products. As part of that work, I analyze the developmental abilities and limitations of children at different ages and the ways these impact how they engage in activities and use products in different environments. I investigate the accident patterns that are unique to children and the effectiveness of strategies used to reduce child injury, such as teaching children safety rules, controlling the environment, and parental/caretaker supervision. For more than twenty years, I have examined various design strategies intended to increase the difficulty of product use by young children and the impact of these strategies on child injuries rates and adult product use. I have conducted tests of young children to investigate their patterns of interactions with various products, including toys, play yards, high chairs, child restraint systems, controls inside motor vehicles, and trunks of motor vehicles.

I have written extensively on the topics of safety information and warning label development. I have studied the area of human information processing including the specific context of processing safety information associated with products. I have also applied risk analysis for the purpose of making decisions about the content of safety messages, measuring the effectiveness of warnings, and guiding decisions about product design. I have contributed to the published

Holly Podulka, Esq.
May 23, 2012
Page 2

research on these topics, and I am a member of the Human Factors and Ergonomics Society, the
American Educational Research Association, and the Society for Risk Analysis.
A list of my publications can be found in the copy of my resume, which is attached. Also
included is a listing of depositions and trial testimony for the past four years. Exponent currently
charges my time at a rate of $440 an hour.

## Incident Background

Based on the review of the supplied materials, I have the following understanding of the
incident:

Around 11:15 am on July 7, 2009, Mr. Orlandus Robinson testifies that he found his
daughter, C█████Robinson (three years old), with her neck caught in the inner cord of a
window blind in her bedroom at her home located at 1541 Bayonne, St. Louis, MO.[1] At
the time of the incident, C█████was home with her mother, Tiara Robinson, her brother,
O█████("Cortez"), who was two years old and her father.[2] Prior to the incident, Mrs.
Robinson testifies that she was in the kitchen making breakfast. Mr. Robinson was
watching television in the family room.[3] While breakfast was being prepared, the
children were traveling back and forth between their bedroom and the family room and
Mr. Robinson testifies that he instructed them to go to their room to calm down.[4]

Based on measurements taken by ESI at the Robinson home, the incident blind covered a
window approximately 71 5/8" wide and 34 1/8" tall and was approximately 46 7/16"
above the floor.[5] The Consumer Product Safety Commission (CPSC) conducted an
investigation of the incident, but at the time it was conducted, the window covering had
been thrown away.  Based on information supplied by the Robinson's attorney to the
CPSC, the blind is purported to have been a horizontal metal blind that was
approximately 69.5" wide and 34" tall.[6] The name of the manufacturer and date of
manufacture of the incident blind is not known.[7] It is alleged that the incident window
blind was manufactured by Kirsch, certain assets of which were acquired by Newell
Window Furnishings in May of 1997.[8] If the incident blind were manufactured by
Kirsch, the evidence suggests that it was manufactured prior to 1989.[9]

---

[1] Saint Louis County Police Department Investigative Report, p. 1; Deposition of Orlandus Robinson (Orlandus
   Robinson), pp. 107, 109, 113, 122-123
[2] SLCH Social Work Assessment; Saint Louis County Police Department Investigative Report
[3] Deposition of Tiara Robinson (Tiara Robinson), pp. 154-155, 158, 162
[4] Orlandus Robinson, p.106
[5] Engineering Systems Inc., inspection measurements, 3/22/2012
[6] Epidemiologic Investigation Report, pp. 1, 3
[7] Tiara Robinson,  p. 221; Orlandus Robinson, pp. 45-46; Epidemiologic Investigation Report, p. 1
[8] Amended Complaint ¶ 5 and 6
[9] Defendant Newell Window Furnishings, Inc.'s Answers and Objections to Plaintiffs' Interrogatories, p. 9;
   Deposition of Stephen Eckhardt (Eckhardt), pp. 210-216; Deposition of Marci Smith, pp. 38, 64, 76

$Ex^{TM}$

Holly Podulka, Esq.
May 23, 2012
Page 3

The plaintiffs allege that the window blind was defective because it did not have proper warnings of strangulation hazards, failed to have a proper cord lock mechanism, failed to contain inner cord stops or cord cleats to reduce access or eliminate loop formation, and did not have a short pull cord.[10]

To evaluate the present case it is necessary to consider 1) available knowledge pertaining to hazards posed to children by window covering cords at different times; 2) scientific understanding of the development and communication of safety information; 3) human response to safety information; and 4) behaviors of Mr. and Mrs. Robinson. Human factors is the scientific study of the limitations and capabilities of people as they interact with products, systems and equipment in their environments. The application of human factors to a particular incident considers the interaction between a person, a product, and a specific environment and how this interaction is influenced by a human's abilities, limitations, perception, knowledge, and patterns of behavior.

Government agencies such as the National Highway Traffic Safety Administration, the Federal Aviation Administration, the National Transportation Safety Board, the CPSC, and the Food and Drug Administration acknowledge the role of human factors in design and evaluation, and employ human factors professionals. The military, aviation, automotive, and space programs have a long history of performing and incorporating human factors research into the design of systems and standards related to such design. These agencies and administrations strive to incorporate a scientific understanding of both the capabilities and limitations of human behavior into safe use and design of products and environments, including the ability to influence safety-related behaviors based on known patterns of injuries and risk, and the communication of this information.

Based on my review of relevant case materials, and my education and experience, I have determined the following:

**Human Factors in the Use of Corded Window Coverings**

Horizontal blinds of the type alleged to have been involved in this incident are raised and lowered by using a "pull" cord that hangs on one side of the blinds.  A plastic "wand" also located on one side of the blinds can be turned or twisted to change the orientation of the slats. To raise and lower, or change the orientation of the slats of the horizontal blinds, consumers never need to touch or contact the inner cords that connect the slats.  To achieve the intended functions of horizontal blinds, such as using them to control light and provide privacy, consumers do not need to separate or pull slats apart with their hands.  Even if a consumer were to pull slats apart beyond the amount afforded by the wand, the inner cords do not form loops.

---

[10] Complaint, p. 3; Report of Shelly Deppa, 05/15/12 ("Deppa report"), p. 11

E𝑥™

Holly Podulka, Esq.
May 23, 2012
Page 4

Inner cords form loops by pulling on the inner cord, which is a misuse of the product and is not an intended use of the blind.

Adults and older children are intended users of window blinds. Window blinds are not intended to be operated by young, pre-school age children. The identification of hazards posed by corded window coverings developed over time, and some of that history is described in the sections below. Despite the decades of effort by regulators and window covering manufacturers to understand child accident scenarios involving cords on window coverings, the identification of the inner cord strangulation pattern did not emerge until the late 1990s. At the time of manufacture of the horizontal blinds alleged to have been involved in this incident, it could not have been reasonably anticipated by the manufacturer that young children would be permitted to gain access to and pull on the inner cords, create loops, and get caught in them.

**Hazards and Warnings Associated with Window Covering Cords**

In 1981, CPSC staff conducted an extensive review of available information regarding consumer-product related accidental ligature strangulations of children less than five years of age.[11] The investigators identified 298 such strangulations in the period from 1973 to 1980, based on CPSC in-depth investigations, consumer complaints and news clips, death certificates, and other files. Among the cases identified were 41 fatalities associated with window covering cords. The report noted that most cases specifically referenced that a child was in a crib at the time of the incident.

Based on the 1981 report, CPSC staff attempted to identify ways in which hazards associated with ligature strangulations could be addressed. The subsequent reports, however, suggested that potential design changes would likely not be effective with regard to window covering cords. Halupka identified window covering cords as an example of a product "not addressable by Commission action since they either are not intended for children or cannot be changed to reduce the hazard without drastically diminishing the utility."[12] Similarly, Rogers reported drapery or blind cords to be among products that "do not appear amenable to product design changes or elimination as a potential strangulation risk."[13] The report further stated, "…increasing consumer awareness of the hazard appears to be the only viable approach."[14]

Consistent with this interpretation of available data, ensuing efforts focused on increasing consumer awareness of the potential hazard. Through its membership in the American Window Covering Manufacturers Association (AWCMA), Kirsch participated in these dissemination efforts.[15] In December of 1985, a release by the CPSC and the AWCMA warned of the danger

---

[11] Rutherford & Kelly, 1981
[12] Halupka 1981, p. 5
[13] Rogers 1982, p. 2
[14] Rogers 1982, p. 7
[15] Defendant Newell Window Furnishings, Inc.'s Answers and Objections to Plaintiffs' Interrogatories, p. 5; Robinson Newell 16770

$Ex^{™}$

Holly Podulka, Esq.
May 23, 2012
Page 5

of child strangulation associated with window blind or drapery cords.[16] The opening sentence of the release specifically mentioned that the concern was related to "pull cords." The release stated, "Most of the children were under two years of age and were in cribs which had been placed near window covering pull cords. Other victims were children who were not in cribs, but who were playing with the cord." The report further stated that children "may reach the cord by climbing on furniture placed near the cord" and warns that these accidents can occur when a child is "alone in a room for only a short time." Suggested means of keeping cords out of children's reach included using clamps or clothes pins, cleats, or tie-down devices, or tying the cord to itself. Safety alerts about the hazard of window blind pull cords and steps consumers can take to reduce the risk continued to be transmitted throughout the 1980s.[17]

Prior to 1989, the time frame of manufacture of the alleged incident blinds, strangulation hazards posed by the inner cords of window blinds had not been recognized. Reviews by Exponent in a previous project of in-depth investigations conducted by CPSC between 1988 and 1993 did not identify inner cords as involved in these events. Of the 44 CPSC in-depth investigations of fatal child strangulations associated with window coverings in this six year period, 37 involved a pull cord and 7 involved an unknown cord (see Table 1). None specified the involvement of an inner cord.

Ms. Deppa references a fatal strangulation in September of 1989 from a support cord of "roll-up, plastic shades that looked like bamboo" that was reported to the CPSC in November of 1989.[18] In their reports, plaintiffs' experts Shelly Deppa and Ben Railsback also identify a letter dated September 5, 1990, from attorney Toni Griesbach to the AWCMA as a date of notice to Kirsch and the window covering industry about the potential hazard of strangulation from inner cords on window blinds.[19] The letter alleged that a child got entangled "in a cord on the back of a woven wood shade".[20] However, inner cords in mini blinds are not the same as support cords in roll-up or woven shades and interactions between children and cords on the back of roll-up and woven shades are different from those between children and inner cords. Furthermore, the brief description of events in a letter cannot be verified to determine its reliability and, in contrast to the information in the letter, investigations conducted by the CPSC prior to 1989 found no entanglements where the inner cord was reported to be involved. The inner cords posed a theoretical risk, but not one that was supported by analysis of actual injury data. At the time Kirsch manufactured the horizontal blinds alleged to have been involved in this incident, it was reasonable that Kirsch did not anticipate the potential hazard posed by inner cords.

---

[16] CPSC Release #85-069
[17] e.g., Robinson Newell 11925-11926, 11927-11928
[18] Deppa report, p. 20, attachment 6b, p. 2
[19] Deppa report, p. 20; Report of Ben Railsback, 05/16/12 ("Railsback report"), pp. 8-9
[20] Birch Exhibit 11

Eᶜ™

Holly Podulka, Esq.
May 23, 2012
Page 6

In 1994, members of the Window Covering Manufacturers Association (WCMA), including Kirsch, worked with CPSC to develop a corrective action program for window coverings.[21] The Window Covering Safety Council (WCSC) was formed the same year.[22] The industry program consisted of three parts: (1) installation of safety tassels to improve the safety of existing window coverings, (2) modifying future production, and (3) implementation of an educational campaign, including product alerts in packaging, brochures, and posters.[23] WCSC's releases about the program were targeted at consumers[24] and broadened to include health professionals, public safety officials, housing officials[25] and child care providers.[26] In 1995, newly manufactured two-corded horizontal window blinds no longer had pull cords ending in loops.[27]

*ANSI/WCMA A100.1 1996, American National Standard for Safety of Corded Window Covering Products*, was approved in November of 1996.[28] This standard, developed in cooperation with CPSC, addressed the use of various devices and components to reduce the possibility of injury, including strangulation. It further specified the use of warnings about pull cords, including placement of labels on the bottom rail and hang tags.

In 1997, the *Journal of the American Medical Association* printed an article co-authored by a CPSC employee, which reviewed pediatric window-cord strangulations in the United States from 1981 to 1995.[29] CPSC characterized the study as "the first study to so thoroughly investigate how these deaths occur."[30] The analysis considered data from 4 different CPSC data sources, including Death Certificates, In-depth Investigations (INDP), the Injury or Potential Injury Incident (IPII) file, and the National Electronic Injury Surveillance System (NEISS). The article identified the specific window-covering component implicated with reported injuries: pull cords (88%), slat strings (7%), bottom horizontal cord (3%), and torn curtain fabric (2%). Based on accident investigations, two injury scenarios were identified as common: "(1) infants in cribs near windows may become entangled in drapery pull cords while sleeping or playing, or (2) toddlers may be suspended from pull cords after jumping or falling from furniture placed near a window" (p. 1697). Pull cords were clearly emphasized with regard to potential safety measures: "Measures can be taken to reduce mortality caused by window pull cords" (p. 1698). The authors of the study did not call out inner cord strangulation as a common injury scenario, nor did they suggest that specific safety measures should be taken to address this hazard.

---

[21] Robinson Newell 16889-16890
[22] http://www.windowcoverings.org/about.html
[23] CPSC Release #95-003
[24] e. g., Robinson Newell 11980-11982
[25] e.g., Robinson Newell 11959
[26] e.g., Robinson Newell 11962-11963
[27] "CPSC Works with Industry to Save Lives: Window Pull-Cords and Strangulations"
[28] ANSI/WCMA A100.1 (1996)
[29] Rauchschwalbe & Mann, 1997
[30] CPSC Release # 97-136

Ex™

Holly Podulka, Esq.
May 23, 2012
Page 7

In 1999, the CPSC began a new "extensive review" of corded window covering deaths in which it "found that children could also become entangled in the inner cords that are used to raise the slats of blinds."[31] CPSC had received reports of 130 strangulations involving cords on window blinds since 1991, of which 16 involved inner cords.  Although CPSC had investigated strangulations associated with window coverings based on data gathered over approximately three decades, it was not until the late 1990s that it identified the injury scenario involving inner cords on window coverings.

In 2000, CPSC and WCSC announced the offering of repair kits for existing window blinds, specifically intended to address the possibility of inner cord loops.[32] Newell, who had acquired certain assets of Kirsch in 1997, participated in this voluntary retrofit program.[33] A toll-free number and web address for the WCSC were provided to assist consumers in obtaining free repair kits. In addition, the newly manufactured window blinds were redesigned to have attachments on the pull cords so that the inner cords could not be pulled out. A revision to the ANSI/WCMA standard was approved in August of 2002.[34] This revision incorporated requirements specific to inner cords and updated the warnings and safety information to be provided.

In his report, Mr. Railsback performs a "risk assessment" and cites counts of fatalities associated with window coverings as support for his opinion that the "risk of strangulation with corded window covering products is occurring frequently".[35] However, the risk associated with a product is not based only on the number of fatalities associated with a product.  Measurements of risk must also consider the amount of exposure to the product.  As of 2002, the WCMA estimated that there were 850 million corded window coverings in homes in the United States.[36] Based on a calculation of risk that considers both the number of fatalities and the number of corded window coverings, I disagree with Mr. Railsback's classification of fatalities associated with window coverings as "frequent."

At the time of the Robinson incident in 2009, Kirsch and Newell, had been warning consumers about strangulation hazards associated with pull cords on window coverings for approximately 24 years. Strangulation warnings about inner cords and retrofit kits had been provided for nine years prior to the incident.  In the two years prior to C████s accident, the WCSC conducted a national media outreach program that covered television, radio, newspapers, consumer and trade magazines, and the internet, with specific efforts made in the state of Missouri, where the

---

[31] CPSC Release # 01-023
[32] CPSC Release # 01-023
[33] Defendant Newell Window Furnishings, Inc.'s Answers and Objections to Plaintiff's Requests for Production of Documents, p. 3
[34] ANSI/WCMA A100.1 (2002)
[35] Railsback report, p. 11
[36] Birch Exhibit 18, p. 2

$Ex^{™}$

Holly Podulka, Esq.
May 23, 2012
Page 8

Robinsons lived.[37] National surveys conducted on behalf of the WCSC found that over 80% of those surveyed in 2008 were aware of strangulation hazards associated with pull-cords and over 77% were aware of the strangulation hazards associated with inner cords.[38]

**Other Sources of Safety Information about Window Coverings**

Additional safety information about window coverings is available from a variety of other sources. Since 1988 ASTM F 1169, Standard Specification for Full Size Baby Crib, has required cribs to contain warnings that they should not be placed near windows where children could get access to cords from blinds or drapes.[39] Additionally, childcare books,[40] parenting websites,[41] as well consumer and safety organizations[42] provide information on how to reduce hazards associated with strangulation from window coverings.

**The Robinson's Knowledge and Use of Window Coverings**

Mr. and Mrs. Robinson claim to have been unaware of any strangulation hazard associated with the cords of window blinds.[43] They do, however, testify that they thought it was dangerous for children to play with window blinds because the blinds might fall on the child.[44] They had this knowledge prior to moving to the house where the incident occurred.[45] They inconsistently acted upon their own understanding of the hazards posed by window blinds.

When the family first moved into the home on Bayonne at least one of the beds was placed under the incident window. Mr. Robinson testifies that the beds were only moved after they saw a child pulling on the pull cord.[46] Mrs. Robinson testifies that the beds were intentionally placed opposite the window because she had seen C█████trying to touch the blinds.[47] Further, Mr. and Mrs. Robinson agree that they "stuffed" the pull cord of the incident window blind up around the head rail.[48] However, despite her concerns, photographs of the interior of the home taken on the day of the accident show that there were cords accessible to the children hanging

---

[37] Robinson Newell 8753; Robinson Newell 9679; e.g., Robinson Newell 8922, Robinson Newell 8885, Robinson Newell 9336-9337, Robinson Newell 9767-9769, Robinson Newell 9794, Robinson Newell 9913
[38] Robinson Newell 8753; Robinson Newell 9679
[39] ASTM F 1169 (1988)
[40] What to Expect The Toddler Years, 1996; The Perfectly Safe Home, 1991; Dr. Spock's Baby and Child Care, 2004
[41] www.parenting.com
[42] Consumer Reports, 2003; Safe Kids USA
[43] Tiara Robinson, pp. 63-65; 168; Orlandus Robinson, pp.71-72, 85
[44] Tiara Robinson, pp. 63-65, 167; Orlandus Robinson, pp. 71-72
[45] Tiara Robinson, pp. 61-62, 166; Orlandus Robinson, pp. 68-70
[46] Orlandus Robinson, pp. 69-70, 74; Alice Ratnaswamy, pp. 103-104
[47] Tiara Robinson, p. 144
[48] Tiara Robinson, pp. 60, 178; Orlandus Robinson, pp. 77-78

E*x* ™

Holly Podulka, Esq.
May 23, 2012
Page 9

from horizontal blinds in the living room[49] and vertical blinds in the family room, where a looped cord was directly over a couch.[50]

Mr. and Mrs. Robinson did not seek out information related to child hazards. Mr. Robinson testifies that he did not do anything to educate himself on how to make his home safe before C███ was born but would ask his mother-in-law about child safety.[51] He states that he did not read newspapers or watch the news, other than sports, would not pay attention to recall announcements or safety alerts, and does not use computers.[52]

Mrs. Robinson testifies that she did not examine the blinds prior to the incident and cannot say whether there was a label on it.[53] Prior to the incident, she testifies that she did not read magazines or take any parenting magazines, read newspapers, go on the internet, or participate in parenting or mother's groups.[54] She seldom watched the news after C███ was born.[55] She did not receive any child safety information from her obstetrician.[56] Mrs. Robinson testifies that she worked as a teacher and in the role of the assistant manager at her mother's licensed day care center for several years, that she got a teaching certificate, and that she took classes that covered safety for toddlers.[57] Mechanical suffocation is one of the leading causes of fatality among children under five (see Table 2). However, she claims that while the courses informed her of the need to keep children in a safe environment, they did not address any strangulation hazards.[58]

Prior to the incident, Mrs. Robinson testifies she was aware of hang tags on window covering products in stores, but did not read any of them and was not aware of articles about recalls of blinds.[59] After the incident, she testifies that she sees such information everywhere.[60] Clearly, there was information about hazards of corded window blinds available to Mrs. Robinson prior to the incident; she failed to seek information about child safety practices including safe practices involving window blinds.  Although there was information "everywhere" about the hazards of corded window blinds, the Robinsons failed to notice and read any of the available information.

---

[49] Tiara Robinson, p. 91; Tiara Exhibit 3, p. 2
[50] Tiara Robinson, pp. 119-125; Tiara Exhibit 8, p. 4
[51] Orlandus Robinson, pp. 90-91
[52] Orlandus Robinson, pp. 98-99
[53] Tiara Robinson, p. 220
[54] Tiara Robinson, pp. 202-208, 234
[55] Tiara Robinson, p. 209
[56] Tiara Robinson, p. 202
[57] Tiara Robinson, pp. 14-16, 20-24, 37
[58] Tiara Robinson, pp. 22-25
[59] Tiara Robinson, pp. 214-216, 229-230
[60] Tiara Robinson, p. 235

E𝑥™

Holly Podulka, Esq.
May 23, 2012
Page 10

**Supervision and Control of the Environment in the Robinson Home**

Methods used by parents to protect children from harm generally include providing supervision, controlling their environment (e.g., installing smoke detectors, adding latches to cabinets, using baby gates), and teaching children safety rules.[61] Reliance only on young children themselves to remember and comply with their knowledge of safety rules in the absence of supervision or environmental controls has not been effective in reducing injury.  Licensed day care facilities also use child supervision and control of the environment to keep the children in their care safe. For example, in Missouri there are specified ratios of the number of adults to children that depends on the ages of the children.[62] There are specific regulations that require that the environment of day care facilities to be safe, including the use of outlet covers or twist-lock outlets, ensuring that all cleaning supplies, poisonous materials, medicines, etc. are inaccessible to children, securely screening all open windows and doors, and keeping the environment clean and free of dirt.[63] Day care facilities are inspected by the licensing agency throughout the licensing period.[64] As part of her education, training, and professional employment in a licensed day care facility, Mrs. Robinson would or should have had greater knowledge of the techniques of supervision and environmental controls than an average parent.

Indeed, home environments often contain products not intended for use by children. [65]  Children whose caretakers fail to supervise or control the environment and merely rely on the children not to interact with hazards in the home have higher rates of injuries.[66]  Table 3 presents the number of hospital emergency room treated injuries for young children associated with products commonly found in homes. These types of products were present in the Robinson household, as demonstrated either by the testimony of Mrs. Robinson or by photographs taken by the police on the day of the incident.

Control of the environment.  Despite her experience as a day care provider and her awareness of several hazards for children in her home, Mrs. Robinson did not take steps to eliminate them. For example, Mrs. Robinson testifies that although she was aware of the need to cover the electrical outlets with plugs and of the hazards associated with children stepping on sharp items,[67] none of the electrical outlets in the home had plugs on them and sharp metal points on tack strips on the floor were present where carpet had been removed.[68] She testifies that she knew about the hazards associated with children getting a hold of electrical cords,[69] however the

---

[61] Morrongiello et al. 2004
[62] 19 CSR 30-62.112 Staff/Child Ratios
[63] 19 CSR 30-62.082 Physical Requirements of Group Day Care Homes and Day Care Centers
[64] 19 CSR 30-62.042 Initial Licensing Information
[65] Morrongiello et al. 2004
[66] Morrongiello et al. 2001
[67] Tiara Robinson, pp. 22-23, 89-90
[68] Tiara Robinson, pp. 90, 98,108-109;Tiara Robinson Exhibit 5, pp. 4-5
[69] Tiara Robinson, pp. 87-88, 134, 256

Ex™

Holly Podulka, Esq.
May 23, 2012
Page 11

children had access to electrical cords from televisions and lamps.[70] Additionally, Mrs. Robinson testifies that there were not any latches on the kitchen cabinets to deter the children from accessing the contents.[71] Photographs taken of the Robinson home reveal several additional hazards, including possible access to a drop into stairway leading down to the basement,[72] medications on a dresser,[73] unstable positioning of televisions and fans,[74] a container of weed or ant killer in the living room,[75] and no child gates to block children's access to hazards.[76]

The police report describes the general condition of the Robinson home as being unclean. For example, the police report states that the kitchen was "in a filthy condition" and Cortez's room as "unkempt with various clothing items and toys scattered around" and "partially eaten food products" on the floor.[77] It further describes the rest of the residence as "unkempt" with food products, crumbs, dirty clothing, and other items throughout on the floor.[78]

Supervision.  Mrs. Robinson testifies that the morning of the incident she was in the kitchen making breakfast, while Mr. Robinson was watching television in the family room and the children were traveling back and forth between their bedroom and the family room.[79] Mr. Robinson testifies that he instructed the children to go to their room to calm down before breakfast because they were hyper.[80] The bedroom was unkempt, as indicated in the police report and in photographs.[81]

There is inconsistent testimony regarding the events around the time of the incident. Mrs. Robinson and Mr. Robinson testify that the children were unattended for approximately two to four minutes, however the police and social work reports indicate that Mr. Robinson stated that C█████ was unattended at least five minutes prior to being found.[82] Mrs. Robinson testifies that as she finished cooking breakfast she heard "something with the blinds" and thought C█████ was probably playing with the window blinds so she instructed Mr. Robinson to check her.[83] Although Mrs. Robinson testifies that Mr. Robinson checked on the children right after her

---

[70] Tiara Robinson, pp. 134-135, 138; Tiara Robinson  Exhibit 9
[71] Tiara Robinson, p. 100
[72] Newell 00047, Newell 00085
[73] Newell 00100
[74] Newell 00098, Newell 00100, Newell 00104
[75] Newell 00122, Newell 00125; Tiara Robinson, pp. 95-97
[76] Tiara Robinson, p. 123
[77] Police report, pp. 6-7
[78] Police report, pp. 6- 7
[79] Tiara Robinson, pp. 154-155, 158, 162
[80] Orlandus Robinson, p. 106
[81] Police report; Newell 00111, Newell 00112, Newell 00117
[82] Tiara Robinson, pp. 197, 199-200; Orlandus Robinson, pp. 106-107, SLCH Social Work Assessment p. 4; Police report, p. 8
[83] Tiara Robinson, pp. 156-157, 177, 197

$Ex^{™}$

Holly Podulka, Esq.
May 23, 2012
Page 12

instruction, the social work report indicates that Mrs. Robinson informed them that he delayed checking on them.[84]

Compared to most parents, Mrs. Robinson would or should have had greater knowledge of the techniques of supervision and environmental controls because of her education, training, and professional employment in a licensed day care facility. However, as described above, multiple potential hazards for children existed in the Robinson home (see Table 3) and Mr. and Mrs. Robinson provided inappropriate supervision and environmental controls for C██████ Previous safety-related behaviors and violation of warned against activities on the part of the Robinsons make it unlikely that had any additional safety information been provided on the incident blind, it would have been followed.

## Ms. Deppa's Reconstruction

In her report, Ms. Deppa provides some descriptions of and opinions about how C████ became caught in an inner cord of the horizontal blinds. The incident blind had been discarded, and photographs taken on the day of the incident show only portions of it, as acknowledged by Ms. Deppa.[85] The condition and size of the blind and all of its component parts, whether the blind functioned properly, its relationship to the window, and other factors are not known and cannot be known. Ms. Deppa uses various calculations to support her conclusion that C████ "had to have been standing on the toy bin" when she reached for the cord.[86] However, the data she uses are only approximations, as no measurements were taken of the incident blind and no complete anthropometric measurements were taken of C████ Despite claiming that C████ was close to the 5th percentile in height and weight compared to others her age, Ms. Deppa appears to have used data for the 50th percentile child in her calculations.[87] In other instances, Ms. Deppa's conclusions are based on information that conflicts with the offered testimony and the evidence as documented in photographs, and therefore are speculative.

---

[84] Tiara Robinson, pp. 156-157, 177, 197; SLCH Social Work Assessment, p. 2
[85] Deppa report, p. 3
[86] Deppa report, pp. 5-11
[87] Deppa report, pp. 8-9

$Ex^{™}$

Holly Podulka, Esq.
May 23, 2012
Page 13

**Summary of Opinions and Conclusions**

In summary, I offer the following opinions to a reasonable degree of scientific certainty:

- The inner cords of horizontal blinds do not present as loops.  To create a loop, an inner cord must be pulled, which is a misuse of the product; consumer operations of horizontal blinds, such as opening, closing, and adjusting slats, do not require consumers to manipulate the inner cords.

- If the incident blinds were manufactured by Kirsch, it was reasonable in the time prior to 1989 for Kirsch not to include warnings about child strangulation on inner cords of window coverings as this hazard pattern was not recognized until many years later.

- The horizontal blind alleged to have been involved in this incident was not unreasonably dangerous or defective based on knowledge of window covering hazards known at its time of manufacture.

- The Robinsons demonstrated a history of disregard for safety information. There is no scientific reason to believe that additional or alternative information on the incident blind would have elicited a greater degree of knowledge and compliance with window covering safety.

- Given the behavior of the Robinsons, there is no scientific reason to believe that additional or alternative information provided by Kirsch or Newell after the incident blind was manufactured would have reached them.

- The supporting information that forms the basis of the reconstruction of the incident conducted by Ms. Deppa is contrary to portions of testimony, is missing important facts, and contradicts other facts, and is therefore speculative.

- In contrast to the conclusion Mr. Railsback reached in his risk assessment, I conclude that the risk of strangulation associated with corded window coverings is low and entanglements with the inner cord represent a small portion of the total risk.

E*™

Holly Podulka, Esq.
May 23, 2012
Page 14

It is my understanding that discovery is ongoing in this matter. I received the report of Ms.
Deppa after close of business on May 16, 2012, and I received Mr. Railsback's report after noon
that same day.  I have attempted to address points made in their reports, but I wish to reserve the
right to supplement my current report. It is likely I may have additional opinions once I have
had more time to review their reports further and I may expand or modify my opinions based on
review of new material as it becomes available.  If you have any questions about this report,
please do not hesitate to contact me.

Sincerely,

Christine T. Wood, Ph.D.
Principal Scientist
Director, Human Factors
(650) 688-7134 direct
(650) 328-2981 fax
cwood@exponent.com

Holly Podulka, Esq.
May 23, 2012
Page 15

## Table 1
## Window Coverings and Cords in CPSC In-Depth Investigations
## Obtained by Exponent as of June 1993

| Exponent Number | Task Number | Date of Accident | Window Covering | Cord Type |
|---|---|---|---|---|
| 1 | 890711HCC1348 | 19880411 | Blinds | Pull cord |
| 2 | 890808HCC3233 | 19880503 | Drapes | Pull cord |
| 3 | 890808HCC3234 | 19880620 | Blinds | Pull cord |
| 4 | 890711HCC1347 | 19880914 | Blinds | Pull cord |
| 5 | 890829HCC3254 | 19881111 | Blinds | Pull cord |
| 6 | 891107HCC3351 | 19890518 | Blinds | Pull cord |
| 7 | 900608HCC1836 | 19890611 | Blinds | Pull cord |
| 8 | 890829HCC3258 | 19890722 | Blinds | Pull cord |
| 9 | 900531HCC3564 | 19890730 | Blinds | Pull cord |
| 10 | 890816HCC1384 | 19890809 | Drapes | Pull cord |
| 11 | 900130HCC3418 | 19890917 | Blinds | Pull cord |
| 12 | 890926HBB3259 | 19890925 | Blinds | Pull cord |
| 13 | 901115HCC2043 | 19891007 | Blinds | Pull cord |
| 14 | 901101HCC0033 | 19901021 | Blinds | Pull cord |
| 15 | 891120HWE5013 | 19891106 | Curtain | Pull cord |
| 16 | 900119HCC1616 | 19891229 | Blinds | Pull cord |
| 17 | 900524HCC2219 | 19900105 | Blinds | Pull cord |
| 18 | 900920HCC2015 | 19900315 | Blinds | Pull cord |
| 19 | 900530HNE5188 | 19900504 | Blinds | Pull cord |
| 20 | 900723HCC3611 | 19900711 | Blinds | Pull cord |
| 21 | 901218HCC1095 | 19900903 | Blinds | Pull cord |
| 22 | 901219HCC0085 | 19891024 | Drapes | Pull cord |
| 23 | 901218HCC2062 | 19901029 | Blinds | Pull cord |
| 24 | 901213HCC0074 | 19901123 | Blinds | Pull cord |
| 25 | 910305HCC0153 | 19910207 | Blinds | Pull cord |
| 26 | 910213HCC1140 | 19910210 | Drapes | Pull cord |
| 27 | 910503HCC0210 | 19910422 | Drapes | Pull cord |
| 28 | 920529HCC0188 | 19910427 | Blinds | Pull cord |
| 29 | 910521HEP2641 | 19910517 | Drapes | Pull cord |
| 30 | 910712HCC2229 | 19910708 | Blinds | Pull cord |
| 31 | 910718HCC1333 | 19910714 | Blinds | Pull cord |
| 32 | 910807HCN1881 | 19910722 | Blinds | Pull cord |
| 33 | 910905CWE7078 | 19910801 | Blinds | Pull cord |
| 34 | 910912HCN2234 | 19910901 | Shade | Pull cord |
| 35 | 911211HCC0052 | 19911001 | Blinds | Unknown |
| 36 | 911031HCC1464 | 19911006 | Blinds | Pull cord |
| 37 | 920722HCC2207 | 19911113 | Blinds | Unknown |
| 38 | 920722HCC2208 | 19911119 | Drapery | Unknown |

$Ex$™

Holly Podulka, Esq.
May 23, 2012
Page 16

| 39 | 920303HNE5088 | 19920208 | Blinds | Pull cord |
|----|---------------|----------|--------|-----------|
| 40 | 920901HCC3229 | 19920304 | Blinds | Unknown |
| 41 | 920721HCC1775 | 19920317 | Blinds | Unknown |
| 42 | 920422HEP1281 | 19920420 | Roll-up blinds | Pull cord |
| 43 | 920720HCC1774 | 19920507 | Drapery | Unknown |
| 44 | 920811CWE5005 | 19920804 | Blinds | Unknown |

E$x$™

Holly Podulka, Esq.
May 23, 2012
Page 17

## Table 2
### Number of Fatalities by Age and Cause of Accidental Death for 2008

| Cause | Age | | | | | Total |
|---|---|---|---|---|---|---|
| | <1 | 1 | 2 | 3 | 4 | |
| Mechanical Suffocation | 996 | 50 | 13 | 11 | 6 | 1,076 |
| Transportation | 104 | 145 | 134 | 115 | 94 | 592 |
| Drowning | 41 | 185 | 124 | 89 | 45 | 484 |
| Other | 68 | 43 | 41 | 42 | 28 | 222 |
| Fire and Flames | 20 | 31 | 43 | 47 | 45 | 186 |
| Inhalation/Ingestion Choking | 62 | 36 | 16 | 9 | 4 | 127 |
| Falls | 13 | 15 | 12 | 7 | 4 | 51 |
| Poisoning | 11 | 14 | 9 | 6 | 6 | 46 |
| Total | 1,315 | 519 | 392 | 326 | 232 | 2,784 |

Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2009 on CDC WONDER Online Database, released 2012. Data for year 2008 are compiled from the Multiple Cause of Death File 2008, Series 20 No. 2N, 2011, Accessed at http://wonder.cdc.gov/ucd-icd10.html on April 30, 2012.

Holly Podulka, Esq.
May 23, 2012
Page 18

**Table 3**
**Number of Hospital Emergency Room Treated Injuries Associated with Some Common Household Products, Children under Age 5, 2008**

| Product Category | Estimated Number of Injuries |
|---|---|
| Beds | 154,826 |
| Tables | 128,585 |
| Stairs, steps, ramps and landings | 91,016 |
| Chairs | 73,920 |
| Doors | 65,001 |
| Sofas or couches | 64,336 |
| Cabinets, racks, room dividers and shelves | 31,567 |
| Bathtubs or showers | 30,390 |
| Desks, bureaus, chests or buffets | 26,596 |
| Windows | 16,593 |
| Aspirin or aspirin substitutes | 12,865 |
| Televisions | 11,702 |
| Nails, screws, tacks or bolts | 11,022 |
| Ovens and stoves | 9,357 |
| Fireplaces | 8,766 |
| Toilets | 5,763 |
| General household cleaners | 4,952 |
| Cookware | 4,259 |
| Sinks and faucets | 3,795 |

Source: Injuries treated in hospital emergency departments from the U.S. Consumer Product Safety Commission National Electronic Injury Surveillance System (NEISS), 2008. Excludes fatalities.

$Ex$™

Holly Podulka, Esq.
May 23, 2012
Page 19

### List of Materials

- Depositions and exhibits
  - Alice Rantnaswamy 02/13/12
  - Arthur Feldewerth 03/08/12
  - Barbara Lane & exhibit 02/22/12
  - Charles Smack 07/07/11
  - Christine Romo & exhibits 02/23/12
  - Cliff Birch & exhibits 2/16/12
  - David Troncosco 02/14/12
  - Harolton Clayborn & exhibit 02/22/12
  - Jody Taylor & exhibits 02/23/12
  - Kristie Sizemore 07/07/11
  - Marci Smith 11/22/11
  - Matthew Wilson & exhibit 02/22/12
  - Orlandus Robinson & select exhibits 10/21/11
  - Rebecca Peyman 07/07/11
  - Roger Palmer & select exhibits 12/20/11
  - Tiara Robinson & exhibits 02/04/11
  - Stephen Eckhardt 03/16/12
  - Ron Bailey 04/26/12
  - Tori Strathman 04/26/12
  - Exhibits 1 to 17 to EMS personnel
  - Robert Nevins & exhibits 03/07/12 (Hawk v Hunter Douglas)
- Amended complaint
- Plaintiffs' Answers to Newell Window Furnishings, Inc.'s First Set of Interrogatories to Plaintiffs
- Plaintiffs' Answers to Supplemental Interrogatories and Responses to Request for Production of Documents to Plaintiff
- Plaintiffs' Responses to Defendant Newell Window Furnishings, Inc.'s First Requests for Production to Plaintiffs
- Plaintiffs' Rule 26(a)(2) Disclosure of Expert Testimony
- Newell Window Furnishings, Inc.'s Responses to Plaintiff's Supplemental Request for Production of Documents
- Newell Window Furnishings, Inc.'s Answers to Plaintiff's Supplemental Interrogatories
- Defendant Newell Window Furnishings, Inc.'s Answers and Objections to Plaintiff's Requests for Production of Documents
- Defendant Newell Window Furnishings, Inc.'s Answers and Objections to Plaintiffs' Interrogatories
- Bates-stamped documents
  - Robinson Newell 00027-00129

$Ex^{TM}$

Holly Podulka, Esq.
May 23, 2012
Page 20

- - Robinson Newell 3350-12593
  - Robinson Newell 16627-16642
  - Robinson Newell 16760-17500
  - Robinson Newell 25709-25740
  - Robinson Newell 26137-26142
- Photographs of blinds (Photos of blind taken at pltfs' counsel office.pdf)
- Photographs of window and brackets (Photos of measurements of blind.pdf)
- Epidemiologic investigation report # 091009CCC2026
- Saint Louis County Police Department Investigative Report
- SLCH Social Work Assessment 07/07/09 for C███Robinson
- SLCH Social Work Progress Notes for C███Robinson
- Medical records for C███Robinson from Christian Hospital Northeast and St. Louis Children's Hospital
- Engineering Systems Inc. photographs and measurements, 03/22/2012
- Expert reports
  - Ben Railsback 05/16/12
  - Shelley Deppa 05/15/12


- *American National Standard for Safety of Corded Window Covering Products* (ANSI/WCMA A100.1-1996).  (1996). New York, NY: Window Covering Manufacturers Association, Inc.
- *American National Standard for Safety of Corded Window Covering Products* (ANSI/WCMA A100.1-2002).  (2002). New York, NY: Window Covering Manufacturers Association, Inc.
- ASTM F 1169-88. Standard Specification for Full Size Baby Crib.
- Eisenberg, A., Murkoff, H. E., & Hathaway, S. E. (1996). *What to expect – The toddler years.*  New York, NY: Workman Publishing Company, Inc.
- Halupka, S. W. (1981). *Analysis of string and elastic hazards to children* [CPSC memorandum]. U.S. Consumer Product Safety Commission.
- Miller, J. (1991). *The perfectly safe home.*  New York, NY: Fireside.
- Morrongiello, B. A., Midgett, C., & Shields, R. (2001). Don't run with scissors: Young children's knowledge of home safety rules. *Journal of Pediatric Psychology, 26,* 105-115.
- Morrongiello, B. A., Ondejko, L., & Littlejohn, A. (2004). Understanding toddlers' in-home injuries: II. Examining parental strategies, and their efficacy, for managing child injury risk. *Journal of Pediatric Psychology, 29,* 433-446.
- New Push to Make Old Blinds Safer.  (2003, October). *Consumer Reports,* p. 9.
- Parenting.  *Babyproofing basics.*  Retrieved online: http://www.parenting.com/parenting/article/0,19840,647785,00.html

E𝑥™

Holly Podulka, Esq.
May 23, 2012
Page 21

- Rauchschwalbe, R., & Mann, N. C. (1997). Pediatric window-cord strangulations in the United States, 1981-1995. *Journal of the American Medical Association, 277*, 1696-1698.
- Rogers, T. (1982). Briefing paper on alternative strategies to address accidental ligature strangulations of children less than five years of age. U.S. Consumer Product Safety Commission.
- Rutherford, G. W., Jr., & Kelly, S. (1981). *Special report: Accidental strangulations (ligature) of children less than 5 years of age*. U.S. Consumer Product Safety Commission.
- Safe Kids USA. *Injury facts – Airway obstruction.* Retrieved online: http://www.usa.safekids.org.
- Spock, B. & Needlman, R. (2004).  *Dr. Spock's baby and child care (8th edition).*  New York, NY: Pocket Books.
- U.S. Consumer Product Safety Commission. (1985). *CPSC warns of the danger of children strangulation in window blind or drapery cords* [Release #85-069]. Retrieved online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml85/85069org.html
- U.S. Consumer Product Safety Commission. (1994). *CPSC and industry redesign products to save lives* [Release #95-003]. Retrieved online: http://www.cpsc.gov/CPSCPUB/PRHTML95/95003org.html
- U.S. Consumer Product Safety Commission. (1996). *CPSC works with industry to save lives: Window pull-cords and strangulations*. Retrieved online: http://www.cpsc.gov/CPSCPUB/PUBS/SUCCESS/cords.html
- U.S. Consumer Product Safety Commission. (1997). *The number of children who strangle in window cords has been under-reported according to a new study in JAMA* [Release #97-136]. Retrieved online: http://www.cpsc.gov/CPSCPUB/PRHTML97/97136org.html
- U.S. Consumer Product Safety Commission. (2000). *CPSC, window covering industry announce recall to repair window blinds: New investigation of children's deaths leads to redesigned window blinds* [Release #01-023]. Retrieved online: http://www.cpsc.gov/CPSCPUB/PREREL/prhtml01/01023org.html
- Window Covering Safety Council.  (2012). *About WCSC.*  Retrieved online: http://www.windowcoverings.org/about.html
- 19 CSR 30-62 (2000). Rules of Department of Health, Division 30-Division of Health Standards and Licensure, Chapter 62-Licensing Rules for Group Day Care Homes and Child Day Care Centers.
- National Center for Health Statistics Mortality Detail Records, 1998
- U.S. Consumer Product Safety Commission Data Sources:
    - The National Electronic Injury Surveillance System (NEISS), 2008
    - In-depth Investigations, 1988-1993

*Ex™*